IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TIMOTHY VAUGHN                          )
                                        )
v.                                      )       No. 3:12-0458
                                        )       Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION          )


To:     The Honorable John T. Nixon, Senior Judge


**<u>REPORT AND RECOMMENDATION</u>**

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial

review of the final decision of the Social Security Administration ("SSA" or "the

Administration") denying plaintiff's application for disability insurance benefits, as provided

under the Social Security Act. The case is currently pending on plaintiff's motion for judgment

on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket

Entry No. 13). Plaintiff has further filed a reply in support of his motion. (Docket Entry No. 17),

in response to which defendant has filed a sur-reply (Docket Entry No. 19). Upon consideration

of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the

reasons given below, the undersigned recommends that plaintiff's motion for judgment be

DENIED and that the decision of the SSA be AFFIRMED.


**I. Introduction**

Plaintiff filed his application for benefits on October 14, 2008, alleging disability

onset as of August 28, 2008. (Tr. 113-14) Plaintiff's disability was alleged to result from

unbearable pain with walking, sitting, and standing for significant periods at a time. (Tr. 131-32)

Plaintiff's claim was denied at the initial and reconsideration stages of agency review (Tr. 75-79,

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

84-87), whereupon plaintiff requested de novo hearing of his claim by an Administrative Law

Judge (ALJ). Such a hearing was held on September 21, 2010, when plaintiff appeared with

counsel and gave testimony. (Tr. 27-49) Testimony was also received from an impartial

vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement

until October 8, 2010, when he issued a written decision in which plaintiff was determined to be

not disabled. (Tr. 13-20) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since August 28, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: status post right hip replacement, osteoarthritis of the left hip, degenerative disc disease of the spine, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he must use a cane when walking and must be able to alternate sitting and standing every two hours.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 22, 1962 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 28, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 15, 19-20)

On March 9, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from plaintiff's brief, Docket Entry No. 12-1, at 2-8:

Plaintiff Timothy Vaughn was born on April 22, 1962, was 46 years old on his alleged disability onset date, and defined (for purposes of vocational analysis) as a younger individual under the nomenclature of the Social Security Regulations (R 127). See 20 CFR 404.1563. He has a high school education (R 137).

The Plaintiff has a very good work history, having been continuously employed from 1983 through his disability onset date of August 28, 2008 (R 126). The Plaintiff testified that he was discharged from his last place of employment because he had become a safety issue due to side effects of his medications (R 31).

On April 19, 2007, the Plaintiff underwent a right total hip arthroplasty (replacement) due to osteoarthritis (R 200). The Plaintiff was released to return to work on September 23, 2007 (R 255). However, he immediately began experiencing pain after returning to work (R 266). Soon thereafter, the Plaintiff began experiencing increased pain in his left hip, and x-rays revealed degenerative changes of the left hip which were more advanced than the last x-rays (R 254). Dr. Snyder then suggested physical therapy, and the Plaintiff continued to work and undergo physical therapy through at least May 2008 (R 250-253). The Plaintiff experienced some improvement in his pain and limitations, although he did continue to have difficulties working (R

250-253).

The Plaintiff's treatment records with Dr. Mangrum from 2006 to 2009 document treatment related to hyperlipidemia, hypertension, gout, back pain, right knee pain, diffuse body aches, hip and back pain, and obesity (R 330-402). Nonetheless, despite these complaints, the Plaintiff continued to work continuously up through his alleged onset date of disability. These records further reveal objective findings of reduced range of motion of the bilateral hips and 1+ edema on June 26, 2008 (R 336), obesity, positive leg lift bilaterally and left great toe enlargement on March 12, 2009 (R 334), and obesity and right leg swelling on October 28, 2009 (R 331). In addition, while these records document the Plaintiff's noncompliance with treatment, they also document the Plaintiff's poor insight (with actions such as drinking two cups of white vinegar per day for blood pressure control) (R 338).

At the request of SSA, the Plaintiff presented for a consultative examination with Dr. Surber on February 8, 2009 (R 299). Dr. Surber noted the Plaintiff was 5'8.5" tall, weighed 316 pounds, and appeared to be morbidly obese (R 300). Dr. Surber's positive examination findings included 2+ pretibial and ankle edema, right greater than left tenderness over the paravertebral musculature, decreased range of motion of the lumbar spine and bilateral hips, and pain in his right greater than left hip and bilateral knees with squat and stand, as well as straight leg raises. Dr. Surber also observed that the Plaintiff appeared weaker standing on his right compared to his left leg, and had a limping antalgic gait toward the right, using his cane in his right hand for support (R 301). Based upon this examination, Dr. Surber opined that the Plaintiff could occasionally lift or carry 10 to 30 pounds provided he did that lifting and carrying with his nondominant left hand, stand and walk with normal breaks for up to two to four hours in an eight-hour workday, and sit with normal breaks for six to eight hours in an eight-hour workday (R 302).

At the request of his treating physician, Dr. Mangrum, the Plaintiff had an MRI of his lumbar spine performed on March 24, 2009 (R 314). This MRI report shows disc desiccation and mild height loss of the L4-5 and L5-S1 discs with mild bilateral facet joint hypertrophy and grade 1 retrolisthesis of L5 on S1, resulting in moderate bilateral neural foraminal narrowing at L5-S1 (R 314).

On April 1, 2009, the Plaintiff's treating orthopedist, Dr. Lowe, wrote a letter to Dr. Mangrum indicating that he had a discussion with the Plaintiff regarding treatment options for his "moderate to severe degenerative disc disease at L5-S1 and at L4-5 with foraminal stenosis at L5-S1 explaining the right L5 radiculopathy," including foraminal injections, physical therapy, and surgical treatment (R 416). On May 5, 2009, Dr. Lowe wrote to Dr. Mangrum stating that the Plaintiff could not afford physical therapy (R 407). Dr. Lowe again wrote to Dr. Mangrum on August 4, 2009, stating that he felt weight loss surgery may be a reasonable route, an injection
was helpful and another would be scheduled, and an x-ray revealed "moderate to severe hip arthritis on the left side" (R 405). Dr. Lowe indicated that the Plaintiff will need a left hip replacement at some point as well (R 405). Finally, on November 17, 2009, Dr. Lowe noted that

4

"[i]t may be that he requires surgical decompression for the foraminal stenosis," and he may be able to avoid surgical treatment with increased conditioning and weight loss (R 413).

The Plaintiff testified at the hearing conducted on September 21, 2010 as follows: He was born on April 22, 1962 and was 48 years of age (R 28-29). He was a high school graduate (R 29). He was 6' 1" tall and current weight was 340 pounds and he explained that he had gained some weight due to inactivity resulting from his severe impairments (R 29). He had worked in the past as a spot welder, a janitor and in a manufacturing concern pouring molten metal into molds forming engine heads (R 29-30). The Plaintiff initially testified he had not performed any welding work in the past 15 years but had worked at one time as a welder (R 31). The Judge challenged the Plaintiff's testimony and pointed out to him that he had completed paperwork for SSA indicating he had worked as a welder in the recent past and Plaintiff stated he could not recall doing any welding in the last 15 years (R 40). At the conclusion of the hearing the Plaintiff asked to make a statement and this was allowed (R 47-48). In his concluding
remarks the Plaintiff explained that he had forgotten that he did some work through a temporary service as a spot welder (R 48). The Plaintiff stated that his jobs usually required the lifting of up to 50 pounds (R 30-31). The Plaintiff stated that he lost his last job because of safety issues associated with the side effects of his prescribed medications which made him drowsy and sleepy (R 31). He also testified that he did not have the physical capacity to perform his past work (R
31).

The Plaintiff testified that he had several physical problems that prevented him from working. He described pain radiating from his low back into his right leg and down to his right foot (R 32). He explained that he had swelling in both his hands as well as his feet (R 32). The pain mostly affected his low back and right leg (R 32). About two years before losing his job he had a total right hip replacement (R 200), and he stated that he had continued to have constant problems with his right hip and leg (R 32-33). There had also been discussions from his treating physician about performing a total left hip replacement (R 405), but the Plaintiff stated he was not agreeable with a left hip replacement simply because of all the difficulty he had experienced with the right hip replacement and he was fearful that he would never be able to walk again (R 33). The Plaintiff testified that he used a cane to assist him with ambulation because he has an off balance gait and a limp (R 33). The cane had not been prescribed (R 33). He also stated that his eyes and heart caused him problems (R 34).

The Plaintiff stated that he was prescribed several different medications (R 34-35), but the medications are not effective in controlling his pain (R 36). He also stated that he has side effects, such as being sleepy and drowsy (R 34-35). The medications are prescribed by Dr. Robert Lowe, his treating orthopedic specialist, and Dr. Timothy Mangrum, his primary care physician (R 35). With regard to activities of daily living, the Plaintiff stated he tried to make the best use of his days (R 39). He explained that he will at times visit with his invalid sister but can stay with her for no more than one hour due to his pain (R 39). He has to lie down and rest about four hours each day (R 35). When he lies down to rest he will place a pillow between his

legs, and this offers him some relief from his pain (R 39). He is not capable of performing any household chores, but he does cook and tries to have a meal ready for his wife when she returns home from work in the afternoon (R 38-39). His wife and daughter do all the household work (R 38-39). The Plaintiff stated that he goes grocery shopping with his wife, and he pushes the grocery cart so he can lean on it for support while walking (R 37). He stated he used to enjoy going to high school football games but no longer does this activity because he cannot sit through a game (R 40). The Plaintiff stated that he had attempted to watch a game in August of 2010; however, he had to depart the game after only 40 minutes because of his pain level and the inability to sit (R 40). He also watches television but his medications usually make him fall asleep while watching the television (R 39).

With regard to his limitation of a physical nature the Plaintiff testified he could stand for no more than one hour, sit for no more than one hour, could not bend from the waist, had to use an assistive device to help with ambulation, could not climb more than six steps, lift on rare occasions about 20 pounds and on a regular basis no more than six pounds (R 36-38).

During the examination by the ALJ, the Plaintiff testified initially that he had not worked as a welder after leaving State Stove in 1990 (R 41); however, he later recalled working as a spot welder for a short time through a temporary service (R 48). He testified that he had applied for unemployment compensation benefits after losing his job but was not awarded the benefits (R 42). Neither the Judge nor trial counsel inquired as to the reasons for not being awarded benefits. The Plaintiff stated he had made applications for employment but was never successful in obtaining a job (R 42). One place he sought work administered testing and he only scored in the 7th grade educational range and he was not offer the job due to the job requiring better reading and math abilities (R 42). Additional questions from the ALJ were directed toward seeking assistance from Tennessee Vocational Rehabilitation, and the Plaintiff stated he did not know what the Judge was talking about, he had never even heard of something called Tennessee Vocational Rehabilitation, and it had "no meaning" to him (R 42-43).

Dr. Pedro M. Roman testified as a vocational expert (R 43). He described the Plaintiff's past work as follows: Welding machine tender, medium and unskilled, and foundry worker, heavy and unskilled (R 44). The ALJ posed only two hypothetical situations to the VE, first asking the VE to consider a person with a sedentary RFC and the need to use a cane to walk and whether or not such a person could perform the work the Plaintiff has performed, and Dr. Roman stated no past work would be available (R 44). Other jobs identified were sedentary level jobs of assembler, charge account clerk and telephone quotation clerk (R 44-45). The second situation mirrored the first with the addition of a need to alternate sitting and standing (R 45). While the ALJ initially stated that this need to alternate would occur every two hours; however, the ALJ subsequently posed the question based upon the need to alternate once every hour (R 45). The VE then stated that the above named jobs would be reduced if the sitting and standing option interfered with productivity (R 46). Trial counsel asked only one question of the VE which was the requirement of lying down to relieve pain for at least one hour out of the work day, and the VE stated there would be no jobs available for one needed to rest one hour out of an eight hour workday (R 46-47).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational

factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir.

1988).

C.  Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in failing to properly evaluate his

credibility, insofar as he found that

> Testimony that he cannot stand or walk for two hours during an eight-hour
> workday and cannot sit more than one hour without interruption is not consistent
> with the medical evidence.  Although claimant has complained to his medical
> providers of difficulty walking, he has never reported an inability to stand for
> more than one hour during an eight-hour period.  Similarly, there are no
> complaints regarding an inability to sit; in fact, the claimant reported he
> sometimes had to sleep at night sitting up because it was painful to lie down.

(Docket Entry No. 12-1 at 11) (quoting Tr. 18)  While the parties argue about whether a patient

with plaintiff's medical history would logically be expected to complain to his treating physician

about the severity of any difficulties with sitting, standing, and walking, the undersigned finds

that these arguments take an overly literal approach to the ALJ's rationale here.  Rather than

holding plaintiff to a standard of complaining to his physicians of limitations which match, in so

many words, his testimony in response to pointed questions about his ability to sit, stand, and

walk, the clear implication from the ALJ's finding here is that it was plaintiff's failure to

complain of symptoms corroborative of such alleged limitations when he presented to his doctors

that undermined the credibility of his testimony.  In fact, plaintiff's testimony to more significant

limitations was given significant weight by the ALJ, to the extent that he found plaintiff limited

to less than a full range of sedentary work despite the fact that plaintiff had been performing

such postural activities at more sustained intervals immediately preceding his alleged onset date,

and in view of the findings of Dr. Surber which are inconsistent with such severe limitations on

standing/walking and sitting.  (Tr. 18)  The ALJ thus credited such progression of disease in

plaintiff's arthritic hip and his lumbosacral spine as the medical evidence would bear (Tr. 17),

but rejected plaintiff's subjective complaints of a level of dysfunction so severe as to produce

9

extreme postural limitations which would preclude even a limited range of sedentary work. All of these factors were appropriately relied upon by the ALJ (Tr. 18), whose credibility determination is entitled to significant weight and deference, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), and should not be disturbed here.

Plaintiff next challenges the ALJ's evaluation of his obesity, arguing that he failed to consider its exacerbating effects on his other impairments and the increased exertional restrictions resulting therefrom. Plaintiff notes the references in the record to his morbid obesity, and argues that the ALJ's failure to explicitly consider its effects on his exertional capabilities is not cured by his assignment of weight to Dr. Surber's assessment, since Dr. Surber failed to recognize plaintiff's obesity as "morbid," instead mistakenly diagnosing it as "moderate." (Tr. 302) However, among Dr. Surber's clinical impressions after examining plaintiff, his obesity is noted first, and is described by reference to his combination of height and weight. Id. Moreover, Dr. Surber's first reference to this impairment, in his "general observation" notes, characterizes plaintiff as "morbidly obese." (Tr. 300) In any event, Social Security Ruling 02-1p, directed to the "Evaluation of Obesity," instructs that such "descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) [do not] establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." 2002 WL 34686281, at *4. This assessment is also required in determining the individual's residual functional capacity, when agency decisionmakers are directed to consider "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." Id. at *6. It is clear to the undersigned that Dr. Surber provided just such an assessment of plaintiff's functional abilities, to which the ALJ assigned great weight, and beyond which he went further still in assigning the additional need to alternate sitting and standing every two hours. By reference to

10

Dr. Surber's examination and findings and otherwise, including by explicit affirmation of the execution of his duty under SSR 02-1p (Tr. 19), the ALJ clearly considered plaintiff's obesity and its exacerbating effects on his other impairments in finding those impairments (including obesity) to be "severe," and in determining his RFC. See Bledsoe v. Barnhart, 165 Fed. Appx. 408, 412 (6th Cir. Jan. 31, 2006) (finding due consideration given to obesity when ALJ credits physician's opinion which considers effects of claimant's obesity). The undersigned finds no error here.

Finally, plaintiff argues that the ALJ erred in failing to state with specificity in his RFC finding the frequency and duration of plaintiff's need to alternate sitting and standing, and further that the ALJ improperly relied upon the vocational expert's testimony, as such testimony was in unreconciled conflict with the job descriptions and definitions contained in the Dictionary of Occupational Titles (DOT). As the first prong of this argument, the RFC finding in this case includes the requirement that plaintiff "must be able to alternate sitting and standing every two hours." (Tr. 15) This requirement does not appear to the undersigned to lack specificity. Even if it did, the ALJ clarified at the hearing, in questioning the vocational expert, that "by alternate, I mean, you can be sitting and then you have to stand up for oh, three to five minutes and then you sit again." (Tr. 45) The vocational expert testified that such a requirement would not erode the sedentary occupational base because "breaks are usually allowed every two hours and they have a break for 15 minute[s] in the morning, 15 minute[s] in the afternoon, and a 30 minute break for lunch." Id. This testimony is consistent with SSR 96-9, which states that

> In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. ... Where th[e] need [to alternate the required sitting of sedentary work by standing periodically] cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded.

61 F.R. 34478-01, 34482 (July 2, 1996).  There is no error in the ALJ's finding of plaintiff's

RFC.

Regarding the alleged conflict between the vocational expert's testimony and

provisions of the DOT, an ALJ is under no obligation to ferret any such conflict out, but must

only reconcile *apparent* conflicts between these sources of vocational evidence.

"The [pertinent] SSR 00-4p does not address what to do when a conflict is not apparent.  Under

the SSR 00-4p, the ALJ is entitled to evaluate the testimony of a vocational expert, the DOT, and

other relevant evidence, but is not required to rely on any of these sources."  Martin v. Comm'r

of Soc. Sec., 170 Fed. Appx. 369, 374 (6th Cir. Mar. 1, 2006).  In Martin, as here,

> Consistent with the SSR 00-4p, the ALJ asked if there was a conflict.  The
> vocational expert testified that there was not.  [Plaintiff] did not bring the
> vocational expert's mistake to the ALJ's attention.  Nothing in SSR 00-4p places
> an affirmative duty on the ALJ to conduct an independent investigation into the
> testimony of witnesses to determine if they are correct.  Furthermore, even if there
> is a conflict between the expert's testimony and the DOT, "neither the DOT or
> [the expert's testimony] automatically trumps when there is a conflict."  SSR 00-
> 4p. . . . Because [plaintiff] did not bring the conflict to the attention of the ALJ,
> the ALJ did not need to explain how the conflict was resolved.

Id.  In the absence of any indication of a conflict before him, the ALJ was entitled to rely on the

unchallenged expert testimony which the expert affirmed as "consistent with the DOT and my

observation of jobs as they are performed."  (Tr. 46)  The undersigned finds no error here.

In sum, the Magistrate Judge finds substantial evidence supporting the findings

and determination of the ALJ that plaintiff is not disabled, and must therefore conclude that his

decision should be affirmed.


## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion

for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 2nd day of May, 2014.


 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE